Jared Weiden, Esq.
A. COHEN LAW FIRM, P.C.
11 Sunrise Plaza, Suite # 304
Valley Stream, New York 11580
(516) 341-7770


IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

---

THEODORE J. LEVY and HELAINE A. LEVY,

                Plaintiffs,

        v.

JAGUAR LAND ROVER
NORTH AMERICA, LLC.,
JAGUAR LAND ROVER LTD.,
and TATA MOTORS LTD.,

                Defendants.

Case No.:

**VERIFIED COMPLAINT**

**JURY TRIAL DEMANDED**

---

       Plaintiffs THEODORE J. LEVY ("Mr. Levy" or "Ted") and HELAINE A. LEVY ("Mrs. Levy" or "Helene"), by and through their attorneys of record, A. COHEN LAW FIRM, P.C., bring this Complaint against JAGUAR LAND ROVER NORTH AMERICA, LLC., JAGUAR LAND ROVER LTD., and DEFENDANTS TATA MOTORS LTD. (collectively, "Defendants"), and allege, on behalf of themselves, upon personal knowledge as to their own actions and their counsel's investigations, and upon information and belief as to all other matters, as follows:

## I.
## PRELIMINARY STATEMENT

Plaintiff, Mr. Levy, was severely injured when the door of his parked, immobile, and seemingly harmless vehicle closed on his thumb, severing a majority of his right thumb. Upon information and belief, the vehicle's soft close automatic door feature created a danger separate and apart from the danger anticipated from a non-motorized vehicle door, in that the soft clause door could unexpectedly self-activate; and once activated, would not detect objects in its path of closure. The force of such closure is steadily maintained at a constant until completion of closure, such that an ordinary person is physically incapable of preventing its closure through the application of brute human strength. The closing force of the soft close automatic door is easily capable of severing a human body part, such as a child or an adult's finger trapped during the closure of the soft close automatic door. Liability arises under the New Jersey Product Liability Act, N.J.S.A. 2A:58C, for actions grounded in design defect, manufacturing defect, and or failure to provide an adequate warning.

## II.
## BACKGROUND

### A.    DEFENDANTS' SOFT-CLOSE AUTOMATIC DOOR

1.      The within action arises out of the grave and serious dangers of the Soft-Close Automatic Doors (hereinafter "SCAD" or "soft close") and the associated technology sold in Defendant-branded vehicles, including, without limitation, the Jaguar XJRL, marketed, distributed and sold by the Defendants as the Soft-Close Automatic Doors (hereinafter "SCAD" or "soft close").

2.      Upon information and belief, Defendants incorporated the SCAD technology as a part of their manufacturing process and assembled said technology for use and distribution in those

select featured vehicles, with the purpose of reducing and/or minimizing the undesirable sound of the slamming of car doors.

3.    Upon further information and belief, Defendant's purpose and goal in implementing, manufacturing, assembling, marketing, distributing, and/or selling SCAD vehicles was to curtail, diminish and attenuate an individual from forcefully closing vehicle doors.

4.    Upon information and belief, SCAD installed on each door of certain Defendant-branded vehicles allegedly detects an individual's attempt to close the door, and once the latch catches the handle, an electric motor is switched on. The electric motor then pulls the door firmly, with a noise that is barely noticeable, to securely complete the door closure.

5.    Sadly, the SCAD feature does not come without the risk and peril of serious injury to an operator, driver, or passenger's limbs and body parts, and the benefits of Defendants' SCAD are outweighed by its dangers, as set forth below.

6.    Upon information and belief, the vehicle's soft close automatic door feature created a danger apart from that typically expected from a non-motorized vehicle door in that the soft close door could unexpectedly self-activate; that once activated, the soft closed door would not detect objects in its path of closure; that the force of such closure would be steadily maintained at a constant until the completion of closure; that an ordinary person would be unable to stop the closure through the application of brute physical strength; and that the closing force of the soft close automatic door was capable of severing a bodily part trapped during its closing process.

7.    Upon information and belief, in comparing Defendants' SCAD technology with Jaguar's automatic power-windows and trunk doors, the power-windows and trunk automatic doors are sensibly designed with a built-in sensor which intuitively and automatically prevents the risk of injury when an object or body part is lodged in its way by automatically reversing itself and

rolling down upon impact, in the case of the power-windows; or raising back up in the case of the trunk doors, with the presumptive purpose of <u>preventing</u> injury.

8.      If only the same were true of the SCAD technology, which Defendants hastily marketed without proper warning to its customers, including Mr. Levy, about the inherent dangers.

9.      Defendants intentionally and deceptively marketed, distributed, and sold their SCAD-featured vehicles without any regard or due care for the obvious safety issues discussed herein.  Nor did Defendants adopt or implement technology already internally available to counter the SCAD risks, such as that associated with the windows or automatic open and close trunks of Defendant-branded vehicles.

10.     Rather than include a sensor to detect when an object was in the way of the SCAD technology — and prevent the SCAD electric motor from triggering the car door and harming customers such as Mr. Levy — Defendants instead elected to market these vehicles with the inherently dangerous features, and place them into the stream of commerce without regard to the possible injuries to its customers.

11.     The SCAD feature is inherently defective in that it lacks basic safeguards, including sensors, to avert the likelihood of personal injuries when the SCAD electric motor is triggered and the sensor latches the SCAD door shut.

12.     Moreover, upon information and belief, multiple tests have been – and likely will continue to be – performed, which demonstrate how substantially similar SCAD doors <u>will not stop</u> for any obstacle as delicate as a finger until it is crushed, pulverized, or severed.

13.     In essence, the SCAD technology falls nothing short of a modern-day guillotine with no possibility by the customer to manually disable the SCAD feature and operation once the electric motor is triggered.  Much like a wide-spreading epidemic showing no mercy, when the

SCAD motor is triggered, it is incontrollable and, because it lacks basic safety sensors, it will crush, sever and/or mangle body limbs such as a human finger.

14.     Upon information and belief, Defendants sweep the details of this serious problem "under the rug" and intentionally conceal the hidden dangers they are aware of, which sadly, a consumer such as Mr. Levy only learned about during his moment of tragedy.

15.     Defendants have failed to warn Plaintiff and other consumers regarding the true dangers of the SCAD technology Defendants knowingly assemble – or have assembled on their behalf – in their vehicles.

16.     Put simply, upon information and belief, Defendants have known for years that the SCAD technology is inherently dangerous, defective and can — and has — harmed its consumers; whether through numerous reviews, its own research, complaints and/or lawsuits brought against it.

17.     Further, Defendants have known, or should have known that substantially similar SCAD technology is inherently dangerous, defective and can — and has — harmed its consumers; whether through numerous reviews, its own research, complaints and/or lawsuits brought against it and/or raised in regard to substantially similar technology utilized by other automobile distributors or manufacturers.

18.     However, Defendants continue to misrepresent, conceal and deceive the public concerning the dangers of the SCAD technology. Moreover, Defendants wholly fail to warn or provide adequate or reasonable notice of the SCAD dangers.

19.     Defendants are at the forefront of technology in every sense and pride themselves on their ability to provide in-house and cutting-edge solutions. That the Defendants, at all levels of pre-production development and post-production monitoring, assessment and review, failed to

detect or anticipate the instant safety issue is unfathomable.  Equally far-fetched would be the preferred notion that the Defendants, having detected the instant safety issue, simply lacked the resources or expertise to properly address the issue.

20.    To stay ahead of the market, Defendants maintain extensively comprehensive databases and conduct extensive research and information gathering activities concerning developments throughout the automotive industries.  Thus, at the very minimum, Defendants were aware that safer alternatives had been developed by companies with far-less resources than that available to Defendants.

21.    This includes technology equipped with a sensor to prevent the door from closing on consumers' and passengers' fingers.  The sensor in these alternative technologies should detect any obstacle between the door and its frame.  Upon sensor detection, the alternative technologies act to stop the door from continuing to close.

22.    This was precisely the <u>kind of technology</u> Defendants failed to implement in their SCAD equipped vehicles which caused the Plaintiff's injuries!

**B.  <u>PLAINTIFF HAD NO KNOWLEDGE OF, AND DEFENDANTS FAILED TO PROPERLY WARN PLAINTIFFS PRIOR TO THE PURCHASE OF THE SUBJECT JAGUAR XJRL, AGAINST THE DANGERS OF "SCAD"</u>**

23.    Upon information and belief, as of the date of their purchase of the subject vehicle, neither Plaintiff was informed by any authorized dealerships or showroom dealers of any dangers, warnings and/or safety issues known by Defendants regarding SCAD technology.

24.    Accordingly, Plaintiffs were never apprised of, informed or warned about the safety issues and concerns Defendants knew, or should have known, about the defective SCAD technology.

25.    In all likelihood, as with the sale of most SCAD vehicles, Plaintiffs were

presumably provided with select specifications, marketing materials, pamphlets and/or brochures from the dealership, which had been prepared and distributed by one or more of the Defendants, or which the dealer had compiled from information provided courtesy of one or more of the Defendants.

26.     Upon further information and belief, Defendants have not, as of the date of Plaintiffs' purchase of the subject vehicle, explained to or warned their dealers and consumers about the serious dangers associated with SCAD. Consequently, the dealers did not – because they could not – inform the Plaintiffs regarding the dangers associated with the soft close automatic doors, including the lack of safety sensors to prevent loss of limb or body part in the doors. Plaintiffs thus could not become aware of the latent dangers of the so-called "soft close" doors.

27.     At the very least, Defendants owed a duty to Plaintiffs and their consumers not to fraudulently conceal the latent and inherently dangerous defects which the Defendants knew or should have known about for many years, but took no active steps to cure or warn, let alone inform their consumers about the latent and defective dangers.

28.     Upon information and belief, as of the injury, neither Plaintiff had been informed by Defendants or by any authorized dealerships or showroom dealers of any dangers, warnings and/or safety issues known by Defendants regarding SCAD technology.

29.     Defendants did not provide Plaintiffs with an adequate warning or instruction such that a reasonably prudent person in the same or similar circumstances would have been provided with respect to the danger, which would have communicated adequate information concerning the dangers and safe use of the SCAD door, taking into account the characteristics of, and the ordinary knowledge common to, the persons by whom the SCAD door was intended to be used.

30.     Specifically, upon information and belief, Defendants were aware of but failed to

inform Plaintiffs and other consumers, or otherwise concealed that the doors of the subject vehicle and of other vehicles posed a substantial safety hazard to the Plaintiffs and/or to consumers in that the vehicles' doors soft close system lacked a sensor that would have enabled the door to retract if the sensor should detect Plaintiff's finger or a consumer's finger in the way of the door; that closing would engage even with the presence of an object in the path of closure; that the soft closing mechanism, once engaged, would not retract the door or suspend the progress of the closure to avoid an object in the path of the closure; that the soft closing mechanism, once engaged, would neither, upon meeting with physical resistance associated with an object in the path of closure, retract the door nor suspend the progress of the closure; that the soft closing mechanism, once engaged would close with great force until it was completely closed or until meeting with physical resistance in the path of closure sufficient to counter the force of the closing mechanism; that human thumbs and fingers in the closure path do not present sufficient resistance to mechanically halt or minimize the force, strength and progress of the door closure; and/or, that human thumbs and fingers in the path of closure are likely to incur serious physical injury.

31.    Upon information and belief, Defendants further concealed the following material facts: The subject vehicle, vehicle doors, and/or SCAD-feature technology was designed, manufactured, marketed, and sold with a defect that posed a substantial safety hazard to the Plaintiff consumer; and the subject vehicle was defective because it was designed or manufactured in such a way that the ordinary and reasonable use of the SCAD-featured technology may cause serious injury.

32.    In light of the aforesaid dangers, Defendants provided insufficient warnings or advisories – or failed to provide such warnings at all – to the Plaintiff concerning the SCAD-featured technology or information concerning where the soft closed mechanism has been initiated

-8-

or triggered by the sensor engine, the door closure process, and the use of <u>extreme</u> care to avoid placing fingers or hands within that portion of the closing path of a soft close door.

33.    Upon information and belief, prior to the purchase of the subject vehicle, Defendants intentionally failed to inform Plaintiffs of the aforementioned safety hazards.  Nor did Defendants inform the Plaintiffs of the hazard at any time prior to the date of the injury.

34.    As a result of Defendants' intentional and willful deceptive practices, the Plaintiffs lacked the pertinent information necessary to make decisions as to whether to purchase a vehicle with a driver door automatic soft-close function, whether (post-purchase) to maintain, alter or disable the soft-close function, and whether (post-purchase) to cease use of the vehicle in favor of an alternate vehicle.

35.    Additionally, as a result of Defendants' intentional and willful deceptive practices, Plaintiff Mr. Levy was not aware of the need for a heightened level of care when utilizing the SCAD-featured technology.

36.    Due to Defendants' intentional and willful deceptive practices, Plaintiff did not take action sufficient to avoid the impact of the soft close door, and thus, incurred the injuries alleged herein, which resulted in losing half of his right thumb.

37.    Defendants consciously failed to disclose material facts to Plaintiffs with respect to the use and dangers associated with the vehicle and SCAD-featured technology.

38.    Defendants intended that Plaintiffs rely on their acts of concealment and omissions so that Plaintiffs would purchase or lease the subject vehicle (and once purchased or leased, would maintain possession and not seek to return the subject vehicle), the subject vehicle doors, and/or lease a vehicle with doors containing the SCAD- featured technology.

39.    Defendants    must    be    held    legally    accountable    for    their    intentional

-9-

misrepresentations, fraud, failure to warn, deception and concealment to the public and Plaintiffs of the dangerous SCAD component and lack of safety measures in their vehicles, such as that of Plaintiffs'.

## III.
## THE PARTIES

40.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "l" through "39" inclusive, with the same force and effect as though set forth fully at length herein.

### A.  Plaintiffs

41.    Plaintiff THEODORE J. LEVY is a person who is, and at all times relevant hereto, was a resident of the town of Jupiter in the State of Florida.  Plaintiff resides at 2710 West Mallory Boulevard, Jupiter, Florida 33458.

42.    Plaintiff HELAINE A. LEVY is a person who is, and at all times relevant hereto, was the lawful wife of Plaintiff, THEODORE J. LEVY.

43.    Plaintiff HELAINE A. LEVY ("MRS. LEVY" or "HELAINE") is a person who is, and at all times relevant hereto, was a resident of the town of Jupiter in the State of Florida. Plaintiff resides at 2710 West Mallory Boulevard, Jupiter, Florida 33458.

44.    Plaintiff THEODORE J. LEVY is a person who is, and at all times relevant hereto, was the lawful husband of the Plaintiff HELAINE A. LEVY.

45.    The plural term "PLAINTIFFS" refers to both Plaintiff THEODORE J. LEVY and Plaintiff HELAINE A. LEVY.

### B.  Defendants

46.    Upon information and belief, Defendant Jaguar Land Rover North America, LLC ("JLRNA") is a Delaware corporation with a principle place of business at 100 Jaguar Land Rover

Way, Mahwah, NJ 07495.

47.      The New Jersey corporate entity number for JLRNA is 0600326118.

48.      Upon information and belief, prior to the 2018 opening of its new headquarters campus at 100 Jaguar Land Rover Way, Mahwah, NJ 07495, Defendant ("JLRNA") maintained its principle place of business and corporate headquarters in the State of New Jersey at 555 MacArthur Blvd., Mahwah, NJ 07430.

49.      Upon information and belief, at all times relevant to the instant matter herein, Defendant JLRNA maintained its principle place of business and corporate headquarters in the State of New Jersey either at 555 MacArthur Blvd., Mahwah, NJ 07430 or at 100 Jaguar Land Rover Way Mahwah, NJ 07495.

50.      Upon information and belief, JLRNA is a wholly owned subsidiary of Defendant Jaguar Land Rover Limited ("JLRL").

51.      Upon information and belief, JLRL is responsible for the design, development, manufacture, assembly, distribution, and sale of Jaguar vehicles, including Plaintiff's vehicle, and including vehicles of the same or substantially similar in design and manufacture to the Plaintiff's subject vehicle.

52.      Upon information and belief, Defendant Jaguar Land Rover Limited is a British corporation with a place of business at Abbey Road, Whitley, Coventry, CV3 4LF, United Kingdom.

53.      Upon information and belief, Jaguar Land Rover Ltd. does business, itself, or through its subsidiaries and affiliates, in the State of New Jersey and the District of New Jersey.

54.      Upon information and belief, Jaguar Land Rover Ltd. is itself a wholly owned subsidiary of Defendant Tata Motors Ltd. ("Tata"), which is registered and domiciled in India.

55.    Upon information and belief, Defendant Tata is registered and domiciled in the Country of India as an Indian multinational automotive manufacturing company, with a place of business at Bombay House, 24 Homi Mody Street, Mumbai, India 400 001.

56.    Upon information and belief, Defendant Tata is the ultimate parent and controlling party of Defendant JLRNA due to Tata's ownership and control of Defendant JLRL, which, upon information and belief, wholly owns and controls Defendant JLRNA.

57.    Upon information and belief, JLRNA distributes, markets, sells, and services Jaguar and Land Rover-branded vehicles, and related parts and accessories throughout the United States.

58.    Upon information and belief, JLRNA was headquartered in the State of New Jersey from the date of the Plaintiff's purchase of the subject vehicle through the date of the subject incident and through the date of the filing of the instant action.

59.    Upon information and belief, JLRNA's New Jersey based headquarters supports retailers throughout North America, including, Upon information and belief, retailers in Florida where Plaintiff Ted purchased his vehicle.

60.    Upon information and belief, JLRNA engages in marketing activities that promote the sale of Jaguar and Land Rover-branded products to customers and/or potential customers located in New Jersey and in the District of New Jersey.

61.    Upon information and belief, JLRNA regularly, continuously, and systematically provides support to and control over the Jaguar Land Rover dealerships located in the District of New Jersey and in the State of Florida.

62.    Upon information and belief, JLRNA employees regularly and systematically work at the Jaguar Land Rover dealership in this District to educate dealership employees regarding

features of the Jaguar and Land Rover accused products sold in this judicial district, including but not limited to soft close door features.

63.     Upon information and belief, JLRNA employees regularly travel to the Jaguar Land Rover dealerships in this district in order to provide support to and exercise control over the sales, marketing, and service of Jaguar and Land Rover automobiles in this District.

64.     Upon information and belief, the technicians employed by JLRNA provide direct supervision and assistance within this District on a regular, ongoing, and continuous basis in connection with warranty repairs being performed within the district.

65.     Upon further information and belief, Defendants transact business throughout the United States, including within the State of New Jersey and the jurisdiction of this Court.

66.     At all relevant times, for the purpose of selling automobiles, other motor vehicles, and vehicle parts in the United States, the State of New Jersey and the State of Florida, Defendants have been engaged in the business of testing, planning, designing, modeling, manufacturing, constructing, assembling, marketing, distributing, selling, and servicing automobiles, other motor vehicles, and vehicle parts throughout the State of New Jersey, the State of Florida and throughout the United States.

67.     Upon information and belief, Defendants have significant contacts with the State of New Jersey, and the activities complained of herein, in whole or in part, occurred in the State of New Jersey.

68.     Plaintiffs are further informed and believe, and based thereon, allege that in doing the acts alleged herein, each of the Defendants is an agent, principal or alter ego of one or more of the other Defendants, and acted with the other Defendants' knowledge, consent, and approval.  As such, each Defendant is responsible for the liabilities of the other Defendant, as alleged herein.

**III.**
**JURISDICTION AND VENUE**

69.     Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1332 (a)(l), as Plaintiffs are completely diverse from the Defendants.

70.     Furthermore, the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs.

71.     Each Defendant is subject to personal jurisdiction in this judicial district in that Defendants have a regular and established place of business in this judicial district, have purposely transacted business involving the alleged products in this judicial district, including the sale to one or more customers in New Jersey, and certain of the acts complained of herein occurred in this judicial district.

72.     Each Defendant is subject to this Court's jurisdiction pursuant to due process and/or the New Jersey Long Arm Statute due to the Defendants' substantial business in this State and judicial district, including, regularly doing or soliciting business in the State of New Jersey, and/or engaging in persistent conduct and/or deriving substantial revenue from goods and services provided to customers in New Jersey.

73.     This Court has personal jurisdiction over JLRNA because JLRNA is distributing, offering for sale and/or selling vehicles in the State of New Jersey and this judicial district, and/or importing allegedly defective XJRL vehicles, vehicles with defective soft closed doors, and/or vehicles with defective soft close automatic door mechanisms and motors into the State of New Jersey and this judicial district.

74.     Defendant JNLRA is subject to the District of New Jersey's personal jurisdiction with respect to the instant action in that Defendant JNLRA is capable of being served in the State

of New Jersey, N.J. Court Rule 4:4-4, and therefore is a resident of the District of New Jersey pursuant to 28 U.S.C. § 1391(c)(2).

75.   Venue is proper in this District under 28 U.S.C. § 1391(b)(1), as Defendant JLRNA is a resident within the District of New Jersey with its corporate headquarters in New Jersey.

76.   Alternatively, venue is proper in this District under 28 U.S.C. § 1391(b)(2) because, upon information and belief, a substantial part of the events or omissions giving rise to the claim occurred within the District of New Jersey.

77.   Upon information and belief, vehicles that are the same model or that are a substantially similar model as the subject vehicle model, vehicles with the same or substantially similar door design and/or manufacture as the doors in the subject vehicle, and/or vehicles with the same or substantially similar soft close automatic door mechanism and motor as that in the subject vehicle were distributed, marketed and ultimately purchased within this district due to the efforts of Defendants, and/or of each Defendant organized or directed by, through and/or in concert with JLRNA's New Jersey headquarters.

78.   Upon information and belief, each Defendant intentionally maintained continuous and systemic contacts in and with the State of New Jersey and the District of New Jersey, and due to the efforts and/or activities of Defendants, organized and/or directed by, through and/or in concert with JLRNA's New Jersey headquarters, vehicles that are the same model or that are a substantially similar model as the subject vehicle model, vehicles with the same or substantially similar door design and/or manufacture as the doors in the subject vehicle, and/or vehicles with the same or substantially similar soft close automatic door mechanism and motor as that in the subject vehicle were distributed in states throughout the nation, marketed in states throughout the nation, and ultimately purchased in states throughout the nation.

79.     The injuries to the Plaintiffs arose from activities intentionally undertaken by the Defendants within the State of New Jersey and this judicial district, which activities were aimed at residents of the State of New Jersey and this judicial district, and the injuries to the Plaintiffs arose out of and/or relate to these activities.

80.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

81.     Moreover, personal jurisdiction is proper under the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution and the New Jersey long-arm statute authorizing personal jurisdiction provides that the court may obtain *in personam* jurisdiction over a defendant within the state, "by delivering a copy of the summons and Complaint to the individual personally." N. J. Ct. R 4:4-4.

82.     Plaintiffs make the allegations in this Complaint without any admission that, as to any particular allegation, they thereby bear the burden of pleading, proving, or persuading. Plaintiffs further reserve the right to plead in the alternative.

## IV.
## FACTS

83.     On April 21, 2017, Plaintiff TED purchased a 2016 Jaguar XJRL vehicle ("Subject Vehicle") from a Jaguar dealership located in the State of Florida.

84.     Among the features of the Subject Vehicle are vehicle soft-close automatic doors (or "SCAD").

85.     On August 7, 2018, TED operated the Subject Vehicle and was helping his wife, HELAINE, and a friend run errands.

86.     While Plaintiff HELAINE sat in the front passenger seat, their friend sat in the back.

87.     After he parked the subject vehicle at restaurant parking lot located at 13981 U.S. Highway 1, Juno Beach, Florida, Ted began to exit the vehicle.

88.     As he exited the driver's side door of the Subject Vehicle, the SCAD door automatic closing mechanism automatically triggered the door to close on Plaintiff Ted's right thumb.

89.     In tremendous pain, TED pulled the door handle with as much force as he could summon, but the door would not open.

90.     The soft close automatic mechanism and motor pulled the driver's door firmly, and not "so softly" pulverized the bone structure, and crushed the flesh, nerves, blood vessels, tendons, and musculature of the distal portion of TED's right thumb.

91.     Plaintiff observed in horror as the door severed the upper portion of his formerly fully functional right thumb.

92.     Blood from his ruptured vessels immediately filled the previously sturdy area that had encompassed the structure of the thumb.

93.     Plaintiff was rushed to Jupiter Medical Center Hospital, which did not have an available hand surgeon.

94.     He was then taken by ambulance to St. Mary's Hospital in West Palm Beach Florida, where emergency surgery was undertaken.

95.     Sadly, the hand surgeon and the medical team were unable to salvage the decapitated thumb.

96.     Presently, his thumb is a shadow of what it used to be, he has limited motor strength, exhibits a limited range of movement, and is in pain daily.

97.     Since the date of the incident, Plaintiff Ted has had, and continues to have, difficulty with even the most mundane of tasks, such as getting dressed, tying his shoes, preparing

food, driving, writing, sleeping, and eating.  Furthermore, he cannot care for his ill wife.

98.     Additionally, since the date of the incident, Plaintiff has had, and continues to have, pain in his shoulder and right arm, which were injured during the incident.

99.     Moreover, Plaintiff sustained nerve damage such that the slightest sensation to the thumb is painful and radiates throughout his entire body.

100.    Of utmost importance has been the impact of the injury on Plaintiff Ted's ability to physically take care for his ill wife, HELAINE.  Prior to the injury, TED was the primary caretaker for his wife, who had suffered a major stroke which left the right side of her body entirely paralyzed.

101.    HELAINE requires assistance to and from her wheelchair, to and from the bathroom, and to and from her bed, as well as getting dressed; tasks which Plaintiff Ted assumed responsibility for.

102.    TED's pain increases as he performs each task associated with the care of his wife.

103.    TED will likely have to hire an assistant to help him take care of his wife.

104.    TED's dominant right hand has been rendered permanently disabled.

105.    TED will spend the rest of his life with a severed right thumb and the associated emotional distress over not being able to take care of his wife as he had prior to the injury, knowing that he will not be able to perform the ordinary tasks to which he was accustomed doing daily throughout his life, and for which his wife continually relied upon him.

106.    Due to his inability to perform simple, yet vital, tasks throughout the day and the continual pain, Ted has become depressed.

107.    Plaintiff's injuries and suffering were **<u>solely caused</u>** – and could have been prevented – by the Defendants' negligence and apathy had they included reasonably available

safety precautions and unambiguous warnings in the design and manufacturing of the SCAD technology.

108.    The diminished ability of HELAINE's husband and primary caregiver was **solely caused** – and could have been prevented – by the Defendants' negligence and apathy had they included reasonably available safety precautions and unambiguous warnings in the design and manufacturing of the SCAD technology.

**V.**
**CLAIMS FOR RELIEF**

**COUNT I**

**(STRICT PRODUCTS LIABILITY-FAILURE TO WARN)**

109.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "108," inclusive, with the same force and effect as though set forth fully at length herein.

110.    Defendants had a duty to warn Plaintiffs about the hidden defects and dangers associated with using the vehicle doors, and/or using the soft closing mechanism which the Defendants were aware – or in the exercise of ordinary care – should have been aware can cause injury, at the time the vehicle, its doors, and/or the soft close mechanism left the Defendants' control.

111.    Defendants designed, tested, manufactured, configured, assembled, marketed, advertised, sold, distributed for consideration, and/or provided at all relevant times, the vehicle, the soft-close vehicle doors, the soft-close mechanism, and the related parts used by Plaintiff Ted at the time of his injury.

112.    At all relevant times, and at the time Defendants designed, tested, manufactured, configured, assembled, marketed, advertised, sold for consideration, and/or provided the vehicle,

the soft-close vehicle doors, and/or the soft-close mechanism, all of which contained defects and/or latent risks only Defendants fully knew about and capable of causing serious injury, such defects and/or risks were known or, through the use of scientific, engineering, and/or automotive knowledge then available to Defendants, should have been known to Defendants.

113.   At all times hereinafter mentioned, these risks and defects presented a substantial danger of serious injury to consumers operating the vehicle, including Plaintiff.

114.   Defendants had a duty to warn Plaintiff TED; and Defendants breached their duty by failing to warn Plaintiff of this danger – that is, the danger that the latent defects in Defendants' products at issue could cause any of its SCAD car doors to automatically close – without any sensor or other preventive safety measures to protect against the Plaintiff's finger, hand, or other body appendage sustaining serious injuries caused by Defendants' "guillotine" machine.

115.   Defendants knew or should have known that the vehicle would be purchased and used by the Plaintiff with no realistic possibility of inspection by him for any latent, or otherwise any concealed defects in the design or manufacture of the product.

116.   Defendants knew or should have known that the vehicle would be purchased and used by the Plaintiff, who would not recognize that the SCAD's engine motor would begin closing irreversibly and would cause such serious harm to Plaintiff in that his finger was severed.

117.   The vehicle purchased and operated by Plaintiff at the time of his injury was defective when it left the control of each of the Defendants, in that one or more soft close vehicle doors was defective when the doors left the control of each of the defendants.

118.   The soft close mechanism in one or more doors of Plaintiffs' vehicle was itself inherently defective when the mechanism left the control of these Defendants.

119.   As to the Plaintiff, the grave and now glaringly dangerous manufacture and design

of the SCAD involved a reasonably foreseeable use of the SCAD mechanism by Plaintiff (which mechanism was inherently dangerous by its defective design, defective manufacturing, and the lack of sufficient warnings), which caused the mechanism itself, one or more vehicle doors, and/or the vehicle as a whole to have an unreasonably dangerous propensity to cause injury to consumers such as Plaintiff. Upon information and belief, said dangers were known or knowable to Defendants, as, upon information and belief, they have been notified or in the course of ordinary care should have been notified, through: (a) consumer complaints; (b) probes by the NHTSA and/or other governmental agencies, quasi-government agencies, industry agencies, and/or other agencies of the possible risks of danger; and (c) Defendants' own research.

120.   The SCAD mechanism, the soft close vehicle doors, and/or the subject vehicle were not reasonably fit, suitable or safe for their intended purpose because of the failure to provide adequate warnings or instructions.

121.   The warnings in the materials provided to Plaintiffs and in marketing or other informational materials – if any –, failed to reasonably warn Plaintiffs, considering the risks known or knowable to Defendants, regarding the danger and peril of serious injury associated with the vehicle, one or more soft close vehicle doors, and/or the soft close mechanism.

122.   The notices – if deemed as such – accompanying the vehicle failed to provide Plaintiff with the level of information that a reasonable and ordinary Jaguar consumer, a reasonable and ordinary luxury vehicle consumer, or a reasonable and ordinary consumer would expect when using the vehicle and/or the vehicle door in a manner reasonably foreseeable to Defendants.

123.   Defendants negligently, recklessly or intentionally minimized and/or downplayed the notice and warning of risk of injury to Plaintiff.

124.   Defendants failed to provide Plaintiff with sufficiently adequate warnings of

dangers which were known or knowable to Defendants, in that the door's sensor, once activated, would automatically trigger the electric motor, which would pull the door firmly and would snap the door shut, without regard for any object or limb placed in the door's path to maximum closure and with no adequate prevention for the crushing of limbs or body parts.  Moreover, Defendants' SCAD mechanism is recklessly designed and manufactured by Defendants without any preventive or precautionary measures to protect the Plaintiff from serious injuries.

125.    Defendants knew or should have known that these substantial dangers were not readily recognizable to an ordinary consumer such as Plaintiff, and that consumers such as Plaintiff would purchase the vehicle without inspection or knowledge of the defective soft close automatic door feature.

126.    Defendants' failure to warn Plaintiff concerning said serious dangers and risk of harm rendered her vehicle, one or more vehicle doors, and/or the soft close mechanism unreasonably dangerous to Plaintiff and other like consumers.

127.    Had the Defendants provided Plaintiff with reasonable notice and warnings concerning his vehicle, one or more vehicle doors, and the soft close mechanism, said notices and warnings could have eliminated, diminished and/or minimized the risk of harm to Plaintiff and other like consumers.

128.    At the time of Plaintiff's injury, Plaintiff was using his vehicle, the vehicle doors, and/or the soft close mechanism in a reasonably foreseeable manner.

129.    Put simply, Plaintiff relied on Defendants' insubstantial warnings in operating his vehicle, and consequently, had no actual or direct knowledge of the accurate safety risks related to them.

130.    As a direct and proximate result of one or more of the above-listed dangerous

-22-

conditions and/or defects, and/or of Defendants' failure to warn and provide adequate notice of dangers to her, Plaintiff sustained serious injury on August 7, 2018.

131.    Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

**COUNT II**

**(STRICT PRODUCTS LIABILITY - MANUFACTURING DEFECT)**

132.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "l" through "131," inclusive, with the same force and effect as though set forth fully at length herein.

133.    At all times herein mentioned, Defendants designed, distributed, manufactured, sold, tested and/or marketed the vehicle, inclusive of the soft close automatic doors and soft close technology to consumers, such as Plaintiff, within the United States.

134.    The Subject Vehicle, the Subject Vehicle SCAD mechanism, and/or one or more of the Subject Vehicle soft close vehicle doors deviated from the design specifications, formulae, or performance standards of the manufacturer or from otherwise identical units manufactured to the same manufacturing specifications or formulae and therefore were not reasonably fit, suitable or safe for their intended purpose.

135.    At all relevant times, Defendants designed, distributed, manufactured, marketed, and/or sold the vehicle, one or more of the vehicle doors, and/or the soft closed technology which was being utilized by Plaintiff at the time of his injury, in a condition such that the soft close mechanism, the vehicle soft close doors and/or the vehicle as a whole was rendered dangerous, unsafe, and defective in its manufacture.

136.    At all relevant times, the vehicle, the soft close automatic doors, and/or the soft close mechanism were expected to and did reach Plaintiff without substantial change in their

condition or in the condition of the soft close mechanism, as manufactured, distributed, and sold by Defendants.

137.    At all relevant times, the vehicle, the soft close automatic doors, and/or the soft close mechanism utilized by Plaintiff contained manufacturing defects in that they were materially different from Defendants' designs or specifications for the reasonably safe use of the vehicle.

138.    At all relevant times, the vehicle, the soft close automatic doors, and/or the soft close mechanism contained manufacturing defects in that the vehicle, the soft close automatic doors, and/or the soft close mechanism differed from other typical units of the same product lines, thereby rendering the vehicle, the soft close automatic doors, and/or the soft close mechanism unreasonably dangerous to consumers such as Plaintiff.

139.    At all relevant times, the vehicle, the soft close automatic doors, and/or the soft close mechanism were used in a manner foreseeable and intended to by Defendants.

140.    As a direct and proximate result of the manufacturing defects herein described, Plaintiff was caused to suffer and sustain the injuries, damages, losses, and harms as set forth herein.

141.    Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT III

### (STRICT PRODUCTS LIABILITY - DESIGN DEFECT)

142.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "l" through "141," inclusive, with the same force and effect as though set forth fully at length herein.

143.    Defendants marketed and/or distributed a product designed in a manner and way that was not reasonably safe.

144.   The Subject Vehicle, the Subject Vehicle SCAD mechanism, and/or one or more of the Subject Vehicle soft close vehicle doors were designed in a defective manner and therefore were not reasonably fit, suitable or safe for their intended purpose.

145.   Upon information and belief, at the time the Subject Vehicle was placed in the market, it was feasible for Defendants to design the SCAD product such that it would perform the function for which it was designed in a safer manner.

146.   Upon information and belief, at the time the Subject Vehicle left the control of the manufacturer, there was a practical and feasible alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of the SCAD door.

147.   Upon information and belief, that the SCAD door of the Subject Vehicle was capable of severing a finger or capable even severely harming a person is not a vehicle door characteristic known to the ordinary Jaguar consumer, the ordinary luxury vehicle consumer, or the ordinary vehicle consumer.

148.   Upon information and belief, the harm caused to TED (that is, the amputation of a portion of TED's thumb) is not an inherent characteristic of a vehicle door, a luxury vehicle door, or a Jaguar vehicle door.

149.   Upon information and belief, the harm to TED was not caused by an unavoidably unsafe aspect of the SCAD.

150.   Upon information and belief, the SCAD was not accompanied by an adequate warning or instruction.

151.   Upon information and belief, the SCAD poses a risk of serious injury to persons other than the target user, such as children.

152.     As such, Defendants' defective design was a substantial factor in causing Plaintiff's injury.

153.     At all relevant times herein mentioned, Defendants designed, fabricated, manufactured, tested, distributed and/or marketed to Plaintiff and consumers situated in the United States, the State of Florida, the State of New Jersey, and this judicial district, the Jaguar XJRL vehicle model with soft close doors, and/or the soft close sensor mechanism associated with the Jaguar XJRL vehicle model, and/or associated with other Defendant-branded vehicle models; and more specifically, the Plaintiff's Subject Vehicle, his driver door, and/or the soft close mechanism associated with the driver door of Plaintiff's Subject Vehicle.

154.     Until the time of Plaintiff's injury, the subject vehicle, the vehicle doors, and the soft close mechanism were each in substantially the same condition as when they had left the possession of the Defendants.

155.     Upon information and belief, the SCAD technology was installed within the Plaintiff's four-door panels and was designed to sense when the door was almost closed.  It then is designed to softly pull the door completely closed and latch it securely.

156.     At the time of, and prior to Plaintiff's injury, the vehicle, the soft close automatic doors, and/or the soft close mechanism were defective in their design in that, among other things, (i) the vehicle, the soft close automatic doors, and/or the soft close mechanism would not, could not and/or did not perform in a manner as safely as an ordinary consumer would expect; and (ii) the vehicle, the soft close automatic doors, and/or the soft close engine and sensor mechanism caused injury to Plaintiff by crushing the Plaintiff's thumb, severing it entirely and causing permanent nerve damage, given that Defendants' product failed to prevent the door from closing on Plaintiff's finger – and acted more like a guillotine – because, upon information and belief, the

SCAD lacked the technology to sense whether anything, such as Plaintiff's finger, was lodged in between the door and its frame, and/or upon information and belief, lacked the technology to automatically abort the closure, and/or otherwise lacked the technology or safety mechanisms to protect against injuries to Plaintiff's finger.

157.    A safer alternative was available on the market and would have ensured that Plaintiff's finger would not have been severed.

158.    For example, to ensure the safety of Plaintiff, passengers, and children, the SCAD engine motor could have been designed with (and thereafter manufactured with) a sensor which would detect whether an obstacle was in the way of the door's closing, so that fingers would be saved and spared from being crushed or severed.

159.    Nor did the vehicle contain any other form of protection for preventing injury to trapped appendages.

160.    The benefits of the SCAD design are unquestionably outweighed by the risks the featured technology poses to consumers such as Plaintiff when used in the intended and foreseeable manner set forth by Defendants. Jaguar's design and manufacturing defects rendered the vehicle, one or more vehicle doors, and/or the soft close technology unreasonably dangerous to Plaintiff.

161.    At the time of, and prior to Plaintiff's injury, the subject vehicle, soft close automatic doors, and/or soft close featured technology was also defective in its design because there existed one or more reasonably alternative designs which would have reduced the risk posed by the subject vehicle, soft close doors, and/or soft close mechanism.

162.    At the time of, and prior to Plaintiff's injury, the subject vehicle, soft close doors, and/or soft close mechanism were further defective in design because alternative designs were

feasible and such alternative designs would have reduced the risk posed by the subject vehicle, the subject vehicle's driver door, and/or the subject vehicle driver door soft close mechanism.

163.    At the time of, and prior to Plaintiff's purchase of the subject vehicle, it was within Defendants' ability to alter the design of the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door such that: (i) the vehicle, the vehicle driver's door, and/or the soft close mechanism associated with the vehicle driver's door would be rendered safer; (ii) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would remain functional; and/or (iii) the vehicle, the vehicle driver door, and/or the soft close mechanism associated with the vehicle driver door would remain reasonably priced.

164.    At the time of, and prior to, Plaintiff's injury it was within Defendants' ability to provide a remedy for the defective design of the vehicle, the vehicle's driver door, and/or the soft close mechanism associated with the vehicle's driver door such that: (i) the vehicle, the vehicle's driver door, and/or the soft close mechanism associated with the vehicle's driver door would be rendered safer; (ii) the vehicle, the vehicle's driver door, and/or the soft close mechanism associated with the vehicle's driver door would remain functional; and/or (iii) the vehicle, the vehicle's driver door, and/or the soft close mechanism associated with the vehicle's driver door would remain reasonably priced.

165.    As a direct and proximate result of the design defects herein described, Plaintiff was caused to suffer and sustain the injuries, damages, losses, and harms as set forth herein.

166.    Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## <u>COUNT IV</u>

### (NEGLIGENCE)

167.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "166," inclusive, with the same force and effect as though set forth fully at length herein.

168.    At all times herein mentioned, Defendants had a duty to properly manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain, supply, provide proper warnings, prepare for use, and sell the aforementioned vehicle with its Soft Close Door-featured technology.

169.    At all times herein mentioned, Defendants knew, or in the exercise of reasonable care, should have known, that the aforesaid vehicle with its Soft Close Door-featured technology was of such a nature that if not properly manufactured, compounded, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared, and provided with proper warnings, it was likely to injure the product's user, TED.

170.    Defendants so negligently and carelessly manufactured, compounded, tested, failed to test, inspected, failed to inspect, packaged, labeled, distributed, recommended, displayed, sold, examined, failed to examine, over promoted, and supplied the aforesaid vehicle with its Soft Close Door-featured technology, that it was dangerous and unsafe for the use and purpose for which it was intended.

171.    Defendants were aware of the probable consequences of the aforesaid conduct.

172.    Despite the fact that Defendants knew, or should have known, that their SCAD technology was capable of causing serious injuries, they failed to fully disclose the known or knowable dangerous risks associated with the vehicle, as set forth above.  Defendants willfully and deliberately failed to avoid those consequences, and in doing so, Defendants acted with a conscious disregard of the safety of Plaintiff.

173.     As a result of the carelessness and negligence of Defendants, the SCAD-designed technology caused Plaintiff to thereby sustain the damages and injuries as herein alleged.

174.     Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT V

## (NEGLIGENT MISREPRESENTATION)

175.     Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "174," inclusive, with the same force and effect as though set forth fully at length herein.

176.     Defendants had an absolute duty to disclose the true facts regarding the safety of the aforesaid vehicle with its Soft Close Automatic Door-featured technology, as Defendants were the only entities capable of knowing and reporting the true facts regarding the safety and testing of their products in that their doors, and that of Plaintiff's vehicle, lacked a sensor that would have enabled the door to retract if the sensor detected that the Plaintiff's finger was in the way of the door closing.

177.     Yet the Defendants utterly failed to do so. They wholly neglected to inform the Plaintiff and other consumers concerning the dangers of the SCAD technology, in addition to the fact that the vehicle did not contain a sensor whose sole goal would have been to detect and prevent the dismemberment of bones and limbs lodged in the SCAD doors.

178.     Nor did the vehicle contain any other form of protection for preventing injury to trapped appendages.

179.     Furthermore, Defendants had a duty to ensure they had a reasonable basis for making the representations as set forth above.

180.  Defendants made the aforesaid representations with no reasonable basis for believing in its truth.  Defendants did not have accurate or sufficient information to support these statements.  Furthermore, Defendants were aware that without such conclusively accurate information, they cannot blankly make the aforesaid representations.

181.  The aforesaid representations were made to the Plaintiff prior to the date she purchased the vehicle, and Plaintiff relied on the representations about the safety of the SCAD-featured technology.

182.  At the time the aforesaid representations were made, Defendants concealed from Plaintiff their lack of information on which to base their representations and their consequent inability to make the aforesaid representations accurately and truthfully.

183.  The aforesaid representations were made by Defendants with the intent to induce Plaintiff to act in the manner herein alleged, that is, to exit the vehicle with the peace of mind that should his finger rest on the door-frame as the door was automatically closing, the door would not subsequently mutilate nor mangle his finger.

184.  Defendants falsely represented to Plaintiff, and members of the general public, that the SCAD-featured technology was safe for use. The representations by Defendants were, in fact, false. The true facts were that the SCAD-featured technology was not safe and was, in fact, dangerous to the hands, fingers and body of Plaintiff, and thereby caused injuries.

185.  Defendants made the aforesaid representations with no reasonable ground for believing them to be true.  They did not have accurate or sufficient information concerning the truthfulness of said representations.  Furthermore, Defendants were aware that without such information they could not accurately make the aforesaid representations.

186.  At the time Defendants made the aforesaid representations, Plaintiff was ignorant

of the falsity of these representations and reasonably believed them to be true.  In reliance upon said representations, Plaintiff acted in the manner alleged herein.

187.    If Plaintiff had known the actual facts, she would not have taken such actions when exiting his vehicle. The reliance of Plaintiff upon Defendants' representations was justified because the representations were made by individuals and entities who appeared to be in a position to know the true facts.

188.    As a result of Defendants' false representations and concealment, Plaintiff was caused to sustain the herein described injuries and damages.

189.    Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT VI

### (FRAUDULENT CONCEALMENT)

190.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "l" through "189," inclusive, with the same force and effect as though set forth fully at length herein.

191.    At all times alleged herein, the Defendants concealed or suppressed a material fact, had a duty to disclose the fact to the Plaintiff, intentionally concealed or suppressed the fact with the intent to defraud the Plaintiff – that is, the Defendants concealed or suppressed the fact for the purpose of inducing the Plaintiff to act differently than he would have had he known the fact – the Plaintiff was unaware of the fact and would have acted differently if he had known of the concealed or suppressed fact, and as a result of the concealment or suppression of the fact, the Plaintiff sustained damages.

192.    At all relevant times, Defendants knew that the vehicle model and the subject vehicle as distributed, marketed and sold was defective in its design and manufacture.

193.    At all relevant times, Defendants knew that the SCAD technology utilized in vehicle model and the subject vehicle as distributed, marketed and sold was defective in its design and manufacture.

194.    Defendants knew that the defect posed a serious safety risk to Plaintiff, but purposefully concealed that information from Plaintiff.

195.    Defendants concealed material information regarding the SCAD defect.

196.    Defendants had a duty to Plaintiff to disclose these dangers because they had exclusive knowledge of material facts regarding the defect and the safety risk to Plaintiff; facts not known to Plaintiff.

197.    Defendants actively concealed from Plaintiff the fact that the vehicle, vehicle doors, and/or the SCAD technology was and is defective and posed a serious safety hazard to Plaintiff at the time Defendants placed the vehicle into the stream of commerce.

198.    Defendants' concealment continues today as Defendants have taken no action to actively warn Plaintiff or other consumers of the defect, or of the serious safety risks associated with the vehicles, the vehicle doors, and/or the SCAD technology.  In a nutshell, Defendants have done nothing to remove the vehicles, the vehicle doors, and/or the SCAD technology from the marketplace.

199.    Defendants fraudulently and intentionally concealed from, or failed to disclose to, Plaintiff the facts described herein with the intent to defraud Plaintiff, and for the purpose of concealing from Plaintiff the latent dangers associated with the SCAD technology.

200.    Plaintiff was not aware of the defective nature of the vehicle and unaware that, because of those defects, the vehicle posed a serious safety hazard.

201.    Had Defendants disclosed the true unsafe and defective nature of the vehicle,

Plaintiff would not have purchased or leased the vehicle.

202.    Axiomatically, the concealment pertains to matters that were exclusively within the Defendants' knowledge and could only have been discovered by the Plaintiff through great difficulty.

203.    As a direct and proximate cause of Defendants' misconduct, Plaintiff has suffered actual damages.

204.    Defendants' acts were undertaken deliberately, and with intent to defraud Plaintiff and the general consuming public, and in reckless disregard of Plaintiff's rights and well-being, and to enrich Defendants.

205.    Defendants' misconduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

206.    Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

<u>**COUNT VII**</u>

**(BREACH OF IMPLIED WARRANTY)**

207.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "206," inclusive, with the same force and effect as though set forth fully at length herein.

208.    At all times alleged herein, Defendants manufactured, compounded, packaged, labeled, distributed, marketed, supplied, prepared, and/or sold to Plaintiff the Jaguar XJRL with soft close automatic door featured technology; and prior thereto, Defendants impliedly warranted to Plaintiff that the SCAD technology was of merchantable quality and safe for the use for which it was intended.

209.    Plaintiff relied on the skill and judgment of Defendants in using the aforesaid

SCAD-featured technology.

210.    Defendants' SCAD-featured technology was unsafe for its intended use and was not of merchantable quality as warranted by Defendants in the vehicles and SCAD-featured technology had very dangerous propensities when put to their intended use and would cause severe injury to the user. The aforesaid vehicle and SCAD-featured technology was unaccompanied by warnings of its dangerous propensities that was either known or reasonably scientifically knowable at the time of distribution.  The aforesaid vehicles and SCAD featured technology caused Plaintiff to sustain damages and injuries, as herein alleged.

211.    Accordingly, Plaintiffs demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT VIII

### (BREACH OF EXPRESS WARRANTY)

212.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "211," inclusive, with the same force and effect as though set forth fully at length herein.

213.    The aforementioned manufacturing, compounding, packaging, designing, distributing, testing, constructing, fabricating, analyzing, recommending, merchandising, advertising, promoting, supplying and/or selling of the aforesaid vehicles and SCAD-featured technology were expressly warranted to be safe for use by Plaintiff and other members of the general public.

214.    At the time of making of the express warranties, Defendants had knowledge of the purpose for which the aforesaid products were to be used, and Defendants warranted the same to be, in all respects, fit, safe, and effective and proper for such purpose.  The aforesaid vehicles and SCAD featured technology were unaccompanied by warnings of their dangerous propensities that

were either known or knowable to Defendants at the time of distribution.

215.    Plaintiff reasonably relied upon the skill and judgment of Defendants and upon said express warranty in using the aforesaid vehicles and SCAD-featured technology.  The warranties and representations were untrue in that the SCAD-featured technology caused severe injury to Plaintiff, was unsafe and, therefore, unsuited for the use for which it was intended. The aforesaid SCAD-featured technology could and did thereby cause Plaintiff to sustain damages and injuries as herein alleged.

216.    As such, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT IX

### (BREACH OF WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT AS SET FORTH IN 15 U.S.C. CHAPTER 50)

217.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "216," inclusive, with the same force and effect as though set forth fully at length herein.

218.    The subject vehicle, the subject vehicle doors, and the soft-close mechanism utilized in connection with the subject vehicle doors are "consumer products," as that term is defined pursuant to 15 U.S.C. Section 2301(1).

219.    Plaintiff is a "consumer," as that term is defined pursuant to 15 U.S.C. Section 2301(3).

220.    Defendants are "suppliers," as that term is defined pursuant to 15 U.S.C. Section 2301(4).

221.    Defendants are "warrantors," as that term is defined pursuant to 15 U.S.C. Section 2301(5).

222.    Defendants provided Plaintiff with "written warranties," as that term is defined pursuant to 15 U.S.C. Section 2301(6).

223.    15 U.S.C. Section 2310(d)(1) expressly provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation…or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief."

224.    Defendants' written representations in the warranty manuals, sales brochures, pamphlets and other writings disseminated by Defendants in the advertising, promoting, marketing, and sales materials of the vehicle and SCAD technology, constitutes an express warranty or warranties made to Plaintiff.

225.    Defendants' statements made in advertising, promoting, marketing and sales of the vehicle constituted implied warranties that the vehicle, the vehicle's soft closed doors, and/or the soft closed mechanism and technology were merchantable and fit for their intended purpose.

226.    Defendants had reason to know, at the time of the sale and delivery of the vehicle to Plaintiff, that the vehicle was required for a particular purpose, namely, as a means of transportation, and that on and within the roads, highways, parking/standing areas (including, without limitation, parking lot parking, parking lot standing, roadside parking, roadside standing, curbside parking, curbside standing) of the State of New Jersey, the State of Florida, and the United States on a daily basis with the reasonable expectation of doing so without a risk of injury during the ordinary and regular course of using a motor vehicle, and that the Plaintiffs and other purchasers, owners, and/or lessees were relying on the Defendants' skill and judgment to develop, design, manufacture, distribute, and sell a safe and suitable vehicle and concomitant soft close door featured technology.

227.   Defendants had reason to know at the time of the sale and delivery of the vehicle that use of the vehicle for transportation necessitated a method of physically moving into and out of the vehicle with the reasonable expectation of doing so without a risk of injury during the ordinary and regular course of using a motor vehicle, and that the Plaintiff and other purchasers, owners, and/or lessees were relying on the Defendants' skill and judgment to develop, design, manufacture, distribute, and sell a safe and suitable vehicle and concomitant soft close door featured technology with a safe and suitable method of ingress and egress.

228.   Defendants had reason to know at the time of the sale and delivery of the vehicle that the soft close vehicle doors were required for a particular purpose, namely as a means ingress and egress, as well as a means of securing the vehicle, with the reasonable expectation of doing so without the risk of injury during the ordinary and regular course of use of the vehicle doors, and that Plaintiff, and other purchasers, owners, and/or lessees were relying on the Defendant's skill and judgment to develop, design, manufacture, distribute, and sell a safe and suitable vehicle and concomitant soft close door featured technology with safe and suitable doors.

229.   Defendants breached these express and implied warranties by offering and selling the vehicle and SCAD technology that, by Defendants' design and construction, contained inherent defects which made the vehicle, the soft close doors, and the soft close mechanism inherently dangerous.

230.   Defendants also breached these express and implied warranties by failing to sufficiently warn Plaintiff of the defects alleged herein, that were, at all relevant times, known to the Defendants.

231.   Defendants breached and continue to breach the aforementioned express and implied warranties as follows:

-38-

i.   At the time of manufacture and sale, there existed an inherent defect in the soft close mechanism, the vehicle driver door, and/or the vehicle;

ii.  The vehicle's soft closed system was not free from defects;

iii. The vehicle's soft closed system lacked a sensor that would have enabled the door to retract or to at least halt the closure process upon detection by the sensor that Plaintiff's finger was in the way of the door's closing;

iv.  The vehicle's soft closed system was and is at all relevant times defective;

v.   Upon information and belief, although similar injuries under similar circumstances have been reported, Defendants have not undertaken a thorough investigation of the cause of the incident and of the safety of the soft close mechanism and the soft-close doors. Nor have Defendants issued any recall or warning about the soft-close mechanism, even though they had numerous communications with and were investigated by the NHTSA.

vi.  Defendants continue to manufacture and sell vehicles with the same soft-closed technology without any sensors to prevent injury, such as the injury sustained by Plaintiff.

232.   As a result of Defendants' breach of express warranties as set forth above, Plaintiff has suffered damages and other losses in an amount to be determined at trial.

233.   Accordingly, Plaintiff demands judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT X

### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY)

234.   Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1"

through "233," inclusive, with the same force and effect as though set forth fully at length herein.

235.    Plaintiffs purchased a vehicle from Defendants, who are defined as a "merchant" with respect to goods of the kind advertised, marketed and sold.

236.    The vehicle, the vehicle doors, and/or the vehicle automatic soft-close mechanism was defectively designed or manufactured such that the vehicle, the vehicle doors, and/or the vehicle automatic soft close mechanism was not reasonably fit for its ordinary purpose or was not minimally safe for its expected purpose.

237.    When used in its usual and reasonably foreseeable manner, the vehicle, the vehicle's soft-closed doors, and/or the soft close mechanism associated with the soft close doors, did not perform in accordance with reasonable expectations.

238.    The defect existed when the vehicle left the Defendants-manufacturers and was present when Plaintiffs purchased the vehicle.

239.    Said defect is the proximate cause of the Plaintiff's injuries.

240.    As such, Plaintiffs demand judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs and disbursements.

## COUNT XI

### (FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS)

241.    Plaintiffs repeat, reallege and reiterate the allegations contained in paragraphs "1" through "240," inclusive, with the same force and effect as though set forth fully at length herein.

242.    As set forth above, the Defendants were careless and negligent in regard to the design, manufacture, and/or marketing of the subject vehicle, the subject vehicle's SCAD doors, and/or the SCAD technology utilized in the subject vehicle.

243.    As set forth above, the Defendants were careless and negligent in regard to the

publication and dissemination of information regarding the safety of the vehicle, the subject vehicle's SCAD doors, and/or the SCAD technology utilized in the subject vehicle.

244.    These negligent actions and omissions by the Defendants were a proximate cause of the Plaintiff's injuries and damages.

245.    As a result of the foregoing, Plaintiff sustained such injuries and damages as set forth above.

246.    The injuries and damages suffered by the Plaintiff was caused in whole or in part by the negligence and carelessness of the Defendants, and without any contributory negligence on the part of the Plaintiff.

247.    Accordingly, Plaintiffs demand judgment against Defendants in such an amount of compensatory, treble and punitive damages as a jury deems reasonable, plus costs.

## COUNT XII

### (FOR LOSS OF CONSORTIUM)

248.    To the extent they are not inconsistent with the allegations in this Count, Plaintiff HELAINE, the spouse of physically injured Plaintiff, TED, incorporates by reference the allegations set forth in Paragraphs "1" through "247" as if fully set forth herein.

249.    As a result of Defendants' misconduct as alleged herein, Defendants are liable to Plaintiff HELAINE, the spouse of physically injured Plaintiff TED.

250.    As a direct and proximate result of the carelessness, negligence, and recklessness of Defendants, and/or as a direct result of the failure to adequately warn Plaintiffs, and/or as a direct result of one or more of the aforementioned design defects, and/or as a direct result  of one or more of the aforesaid injuries to her spouse, Plaintiff HELAINE has been damaged as follows:

     i.    Plaintiff HELAINE has been and will continue to be deprived of the full

and complete services, support, maintenance, guidance, companionship and comfort of her spouse;

    ii.    Plaintiff HELAINE has been and will continue to be deprived of the full and complete care-giving services that had until the time of the injury been provided by TED;

    iii.    Plaintiff HELAINE has been and will continue to be deprived of the additional financial resources allocated by HELAINE and/or by TED for HELAINE's care that, but for the injury to TED, would not have been necessary to allocate for HELAINE's care and would otherwise have been utilized for the care of HELAINE or that would have remained unallocated and available to HELAINE or to be used on behalf of HELAINE;

    iv.    Plaintiff HELAINE has been and will continue to be required to spend money for medical care and household care for the treatment of her spouse;

    v.    Plaintiff HELAINE has been will continue to be deprived of the financial resources allocated by HELAINE and/or by TED for Ted's care that would otherwise have been utilized for the care of HELAINE or that would have remained unallocated and available to HELAINE or to be used on behalf of HELAINE;

251.    The conduct of the Defendants as alleged herein was willful, wanton and/or in reckless disregard for the rights of Plaintiffs-Spouses and punitive and exemplary damages should be assessed against Defendants.

252.    Accordingly, Plaintiffs demand judgment against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs.

## VI

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request the following relief:

A.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count I as alleged herein;

B.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count II as alleged herein;

C.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count III as alleged herein;

D.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count IV as alleged herein;

E.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count V as alleged herein;

F.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count VI as alleged herein;

G.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count VII as alleged herein;

H.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count VIII as alleged herein;

I.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count IX as alleged herein;

J.  An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count X as alleged herein;

K.  An order or judgment in favor of Plaintiffs and against Defendants in such an

amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count XI as alleged herein;

L. An order or judgment in favor of Plaintiffs and against Defendants in such an amount of compensatory and punitive damages as a jury deems reasonable, plus costs, for Count XII as alleged herein;

M. Punitive damages for each and every Count alleged herein; and

N. For such other further relief as this Court deems just and necessary.


Dated: June 6, 2019
        Valley Stream, New York


                                    A. COHEN LAW FIRM, P.C.


                    By:    _____
                           Jared Weiden, Esq.
                           11 Sunrise Plaza, Suite # 304
                           Valley Stream, NY 11580
                           Telephone: (516) 341- 7770
                           *Attorneys for Plaintiffs*

## ATTORNEY CERTIFICATION

Under Federal Rules of Civil Procedure § 11, by signing below, I certify to the best of my knowledge, information, and belief that this Amended Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Amended Complaint otherwise complies with the requirements of Rule 11.

Dated: June 6, 2019
      Valley Stream, New York

                                                            JARED WEIDEN, ESQ.